[Civ. No. 3761.   Fourth Dist.   Apr. 4, 1949.]

HELENE N. FREDERICK, Appellant, v. JOE FOX, Respondent.

Frederick E. Hoar for Appellant.

William Crum for Respondent.

BARNARD, P. J.—The defendant subdivided a tract of land near a naval base and not far from the eastern boundary of Kern County. In the fall of 1944, he was selling lots in this subdivision although a map had not yet been accepted or filed and much of the street and other required work had not been done. On October 1, 1944, he sold a lot to Wm. W. Johnson, giving him receipt No. 8502, which reads:

"Oct 1st 1944   8502

"Received from Wm. W. Johnson – – – Twenty five – – – Dollars 1st pmt on lease on Lot 1 Blk H. Kern Sub Div. 1234

| | How Paid | Balance due | |
|---|---|---|---|
| $25/00 | check | 75/00 | Joe Fox" |

A month later, he gave Johnson a new receipt, numbered 8535, which reads:.

"Replacing 8502

"Oct 1 1944    8535

"Received from Wm. W. Johnson
– – – Twenty five – – – Dollars 1st pmt on Lot .
#12 Blk H. to be deeded upon map acceptance

|  | How paid | Balance due |  |
|---|---|---|---|
| $25/00 | cash | 75/00 | Joe Fox" |

Lot 1 and Lot 12 in Block H are adjoining, Lot 1 being to the north of Lot 12. A map was accepted and filed in January, 1945. The Johnsons moved two cabins onto Lot 12 early in January and for some eight months lived there with their five children. In September, 1945, Mrs. Johnson, who handled the business for her husband, informed the defendant that they were leaving and requested a paper to show that they had a right to transfer their equity in the property. The defendant signed and gave her a paper, which reads:

"I will transfer Lot Equities upon endorsement of receipt of lot payments.

"Joe Fox

9/7/45"

On the same day Johnson sold the two cabins which were on Lot 12 to the plaintiff and, when they were paid for, endorsed receipt No. 8535, transferring his equity to Mrs. Frederick. Mrs. Frederick moved in and was still living on the property at the time of the trial. The defendant, who lived seven blocks from Lot 12, did not inform either Johnson or Mrs. Frederick that a map had been accepted and filed, and did not tender a deed. Mrs. Frederick made several unsuccessful efforts to find the defendant at home and when she finally found him in May, 1946, he refused to recognize that she had any interest in the lot. It was first stated that he intended building on the lot himself. Later, he said that the Johnsons had agreed to erect a $2,500 building on the lot and operate a cleaning works and that this agreement had not been kept. About six months later, the defendant brought an action in ejectment in the justice's court. Thereafter, the plaintiff brought this action for specific performance of the agreement to convey Lot 12, offering to pay the balance of $75.

Mrs. Johnson testified that the defendant showed her several lots, including Lots 1 and 12 in Block H, all priced at $100

each; that she told him they had these two cabins and he offered to loan her equipment with which to move them; that she picked Lot 1 because it would be cooler there in the desert, as it faced north; that she paid him $25 and he gave her receipt No. 8502, which she understood was a receipt for the down payment on the purchase price of that lot; that about a month later, she passed Lot 1 and saw that a house was being built on it; that she went to see the defendant and he told her that he had a prior commitment on Lot 1 but would give her Lot 12, which was adjoining; that he then gave her receipt No. 8535 and marked it "Replacing 8502"; that at that time she offered him the balance of $75 and requested a deed to Lot 12; that he explained that he could not give a deed because the subdivision was in process of remapping, and put on the receipt "to be deeded upon map acceptance"; that they then moved the cabins onto the property and lived there; and that in September, 1945, she asked the defendant for something in writing to show to Mrs. Frederick that he would accept the transfer of their equity in this lot, and the defendant gave her the writing dated September 7, 1945.

The defendant testified that at their first interview Mrs. Johnson told him that on account of her children she just had to have a place to live; that he told her that to get a lot she would have to build on it; that he further told her they needed a laundry or cleaning business in the new town; and that she agreed to build a building costing at least $2,500 and to operate a laundry or cleaning establishment, if he would sell her the lot. He further testified that he then leased the lot to her for $100 a year, "until she showed some evidence of building," and gave her receipt No. 8502; that a month later Mrs. Johnson told him "she couldn't finance herself with a lease, she would have to have a contract to purchase"; that he told her he couldn't give her a deed until the map was approved, but would give her a contract to purchase if she wanted to use it to finance her building; that he then gave her receipt No. 8535; that in September, 1945, Mrs. Johnson told him they were leaving but had a party who would go through with the deal, and requested a paper to show their right to transfer their equity in the property; that he then gave her the paper dated September 7, 1945; and that he knew nothing further in connection with the lot until Mrs. Frederick approached him in May, 1946. He also testified that Lots 1 and 12, as mentioned in the two receipts, referred to the same lot, and that

the lot picked out by Mrs. Johnson was renumbered as Lot 12 in the official map when it was filed. It is significant, in this connection, that early in the trial the defendant produced his carbon copy of receipt numbered 8502, which was represented to be a true copy of the original, although it described the lot as Lot 12 in Block H. Mrs. Johnson insisted that her original receipt read Lot 1 in Block H. She later found and produced the original, which was for Lot 1 in Block H. The defendant's explanation of why he altered his copy of this receipt is far from satisfactory. Most of defendant's testimony was received over the objection that it tended to vary the terms of a written contract.

The court found, among other things, that on October 1, 1944, the parties entered into an agreement whereby the defendant leased the property to Johnson for one year for $100, "upon the express understanding" that Johnson would erect a building costing $2,500 in which he would establish and maintain a dry cleaning establishment; that Johnson paid $25 and this agreement was evidenced by receipt No. 8502; that receipt No. 8535 was later given upon the representation that Johnson was unable to finance such a building unless he could show a contract to buy the property rather than a lease; that the paper dated September 7, 1945, was given because the Johnsons told the defendant that they were unable to carry out the agreement to build a cleaning establishment, and so they could transfer their equity to some person who would carry out that agreement; that the plaintiff acquired her interest in the property, if any, with full knowledge of the agreement that a cleaning establishment was to be built; and that the plaintiff has refused to carry out this agreement to build such a building. Judgment was entered for the defendant and this appeal followed.

While there is oral evidence to support the finding of an agreement to erect a $2,500 building and operate a cleaning establishment, that finding is not controlling here. Incidentally, it may be observed that such a finding here places an undue strain on the credulity of anyone reading the cold record. It hardly seems reasonable that a person looking for a cheap home would agree to erect a $2,500 business building, and pay a rental of $100, in order to get a one-year lease on such a lot. The respondent knew that the Johnsons were looking for a lot upon which to move two shacks so that they could live close to their work at the naval base, he knew they were unable to finance such a building, and according to his own

testimony he did not even ask whether they knew how to run a cleaning establishment. He made no objection to the moving of the cabins upon the lot, for living purposes, and he even offered his assistance to that end. While he testified that he was anxious to get a cleaning establishment there as it was needed in the town, he also testified that no limit whatever was specified as to when the building should be erected or the business established. He paid no attention to the matter for nearly two years, and the claimed oral agreement to build such a building was the second excuse offered for failing to complete the transaction. The respondent's actions throughout, his insistence that only one lot was ever involved, his reliance on an altered copy of the first receipt, and his belated explanation of why he altered it, are so suggestive that his manner of testifying must have been very convincing to have overcome the adverse effect of his own testimony.

■ Assuming that such an agreement to build a business building existed at the start there is absolutely no evidence in the record which even tends to indicate that this appellant had ever heard of or knew anything about such an agreement. The court's finding that she had full knowledge of this agreement is entirely without support in the evidence.

■ Further assuming that such an agreement existed at the start, and that oral testimony with respect thereto was admissible insofar as receipt No. 8502 is concerned, a different situation appears in connection with receipt No. 8535. That was not only a receipt, but it constitutes an agreement to convey this lot. There is no ambiguity in its language. The terms are fully stated, $25 paid in cash and a balance of $75. It is specifically stated that the lot is to be deeded upon the acceptance of the map, and this fixes the time for the payment of the balance due. Nothing was said therein about any agreement to build a building, and oral evidence was not admissible to change the terms of the contract as set forth in the instrument. If there ever was an oral agreement for the erection of a building, it was replaced by the subsequent unqualified written agreement for a deed upon specific terms.

Not only was this true with respect to the Johnsons, the original purchasers, but it applies with even greater force to this appellant who was led to purchase the equity in the lot, together with the cabins thereon, by the paper dated September 7, 1945, which was admittedly issued by the respondent for the very purpose of enabling the Johnsons to

make this transfer, and without in any way referring to or calling the new buyer's attention to any additional oral agreement supposedly entered into as a part of the consideration for the purchase of the lot. Not only was the finding of knowledge on the part of the appellant unsupported, but the main and controlling findings in the case are based entirely upon oral evidence which was inadmissible, and which could not be accepted as varying the terms of the written contract and adding thereto an important element which completely changed that contract. Moreover, it appears without conflict that the appellant was misled into buying the equity without knowledge of any oral agreement. Under well-established rules the judgment should be reversed, and it would serve no useful purpose to discuss and analyze the various cases cited by the parties in this connection.

The court made no finding that the contract was not just and reasonable, or that the consideration was inadequate. As clearly appears, the decision was based upon the existence of an additional oral agreement to erect a $2,500 business building, and a breach of that agreement. While some evidence was produced with respect to the value of the lot, it was unsatisfactory in nature. While the court found that this lot "was" worth $500, this finding is both indefinite as to time and inconsistent with another finding that the lot is now worth $500, since the evidence clearly discloses that the value of the lot had greatly increased. This entire matter may be fully presented, and considered on its merits, in the event of a retrial.

The judgment is reversed.

Griffin, J., and Mussell, J., concurred.